**READING COMPANY**
v.
**The UNITED STATES; Michael KING and Columbia Waste Material Company, Third-Party Defendants.**
**No. 49792.**

United States Court of Claims.
March 1, 1955.

· William P. McClure, Washington, D. C., for plaintiff.

John E. McClure, Washington, D. C., William I. Woodcock, Jr., Andrew C. Armstrong and A. W. Hesse, Jr., Philadelphia, Pa., were on the briefs.

Frank J. Keating, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Nathan L. Posner, Philadelphia, Pa., for Columbia Waste Material Co., third-party defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

Sales Contract Branch, Quartermaster Supply Section, Utah General Distribution Depot, Ogden, Utah, an installation of the United States Army, invited bids on a quantity of surplus property, designated as "Pads, filter, gas mask, wool and resin, weather damaged, new, approx. 418,800 each, D–2." One Michael King of Philadelphia bid $21.15 for the lot, which consisted of some fifteen tons of material. His bid was accepted by A. J. Bybee as Contracting Officer, and he was on June 28, 1948, mailed a copy of the contract, a request for payment of the balance of $6.15, and a direction to remove the property or furnish shipping directions within ten days. On July 2, King sent the $6.15 and requested information as to whether there was in Ogden a trucking company that he might get to pick up and store the property, if he should desire to leave it in Ogden. He also said that if he decided not to store it there he would telegraph shipping instructions immediately upon being advised of its gross weight.

On July 7, the contracting officer advised King that the gross weight was approximately 29,316 pounds and named a storage company in Ogden. On July 10, King advised the contracting officer that he was sending the storage company an authorization to pick up the property. King apparently changed his mind, because on August 20 he requested the contracting officer to ship the goods to him at Philadelphia by rail. Pursuant to that request, the Army's transportation agent at the depot delivered the goods to the Union Pacific Railroad and they were carried by that and other connecting railroads, the last one being the plaintiff, the Reading Company, to Philadelphia. The bill of lading was a regular commercial bill of lading, signed by the Army's Transportation Agent, as such agent, as consignor. The shipment was, of course, a "collect" shipment. The agent executed the "nonrecourse clause" of the bill of lading, the text of which appears in finding 7.

Upon the arrival of the goods in Philadelphia, the plaintiff railroad on September 13 notified King of the arrival and of the amount of the freight charges, $1,866.29 plus tax. On September 21, King wrote the railroad that he would not be able to take up the shipment "due to the high freight charges." The plaintiff then telegraphed the Army's Transportation Agent at Ogden telling him that the consignee had refused the shipment and asking what disposition should be made of it. The Army's Chief of its Transportation Branch at Ogden suggested that plaintiff have King certify that the material was to be used as scrap rags and thus get a lower freight rate. In the meantime, at plaintiff's request, the proper authorities did reclassify the material as "filters" which classification reduced the freight charges to $1,254.58 plus tax.

The plaintiff notified King, and the Army at Ogden, of the revised charges; notified King that the goods would have to be sold unless the charges were paid within a few days; and requested the Army to advise what disposition should be made of the goods. On October 9, King requested the plaintiff to dispose of the goods. On October 16, the Army advised the plaintiff that the transaction concerned only the plaintiff and King, and not the Army.

After due advertising, the plaintiff sold the goods on January 5, 1949, at public auction for $193.20. On March 8 and May 12, 1949, the plaintiff sent bills to King for $1,378.21, which was the amount of the freight, demurrage and expenses of sale less the amount received at the sale. He did not pay. On June 9, the plaintiff billed the Army, but the answer was again that the transaction was between the railroad and King. King, on September 7, 1949, wrote the plaintiff that he had acted in the transaction as the agent of the Columbia Waste Material Company. This statement was not true.

The plaintiff persisted in its claim that the Government was liable for the charges. The Army referred the matter to the General Accounting Office, but the claim has not been paid. The plaintiff again reduced the freight rate, this time to $875.09, which, together with the additional charges for demurrage, advertising, etc., and less the amount received on the sale of the goods, leaves a balance due the plaintiff of $966.63.

■ The Government concedes that, ordinarily, one who ships goods to a consignee, "collect," is liable for the freight charges if the consignee does not pay them. It says that it was not the shipper; that a man named Vard L. Hurst, who just happened to be the Transportation Agent of the Army's depot, shipped the goods as a personal accommodation to King, the purchaser. But this was not the fact. When the Government's contracting officer awarded the contract to King, he directed King to furnish shipping directions, if he wanted the goods shipped. He did not say that if he got such directions he would try to find some person around the installation who would be willing, on the Government's time and with the Government's facilities, to personally accommodate King, of whom this person had never even heard, by shipping the goods for him. The contracting officer meant that the Government, which had sold the goods to King, would do what sellers usually do when they sell goods to people in distant places, i. e., ship the goods to them. Hurst, as Transportation Agent for the Government, signed the bill of lading in the same way that he signed all other bills of lading for shipments made by the Government.

■ The Government urges that its agent's execution of the "nonrecourse clause" made the Government immune from liability for the freight charges. This contention is not well-founded. The nonrecourse provision is:

> "The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges."

This means that if the carrier waives its lien for the freight charges, which

lien is usually adequate security for them, by surrendering the goods without collecting the charges, the shipper will no longer be liable for the charges. Here the plaintiff railroad did not surrender the goods, and the nonrecourse clause had no application or effect.

 The Government argues that the plaintiff billed King for more than the lawful freight charge and thereby forfeited its right to hold the property and was guilty of a conversion when it sold the property for the freight charges. It will be remembered that the plaintiff first billed King for $1,866.29 plus tax. King replied that he was unable to take up the shipment "due to the high freight charges." He did not complain that the charges were improper. Later the plaintiff on its own motion changed the classification of the goods and reduced the charges to $1,254.58 plus tax, but King still did not pay them. After the goods were sold the plaintiff reduced the charges to $875.09, apparently the charges applicable to scrap rags, which reduction King could, it seems, have obtained at any time by certifying that the goods would be used as scrap rags.

The fact seems to be that when King's hope of quickly reselling the goods to the Columbia Waste Material Company was disappointed, he was unwilling to pay $1,866.29 or any other large sum to obtain possession of the $21.15 worth of goods he had purchased. The erroneous classification of the goods and the consequent overcharge of freight was not the reason for King's failure to pay the charges. And even if there had been a wrongful conversion, which there was not, there is no evidence that the goods were worth more than the plaintiff obtained for them by its sale at public auction.

The Government has filed a contingent claim against the Columbia Waste Material Company, and against King, asserted to be the agent of the Columbia Company, asking that if any judgment be rendered in favor of the plaintiff and against the Government, a judgment for the same amount be rendered in favor of the Government against Columbia and King. As to Columbia there is no evidence that King was its agent in the transaction or that Columbia was involved in any way in the transaction. The Government's claim against Columbia is therefore dismissed. King, by his direction, was the consignee of the goods, and, as between him and the Government, was obligated to pay the freight.

The plaintiff may have a judgment against the United States for $966.63. The United States may have a judgment for the same amount against King.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.